1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

8
9
10
11
12
13
14
15
16
17
18

LYNDA M. KLYMKO,

                    Plaintiff,

          vs.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-06-0308-AAM

**ORDER GRANTING
PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT,**
*INTER ALIA*

19
20
21

**BEFORE THE COURT** are plaintiff's motion for summary judgment (Ct.
Rec. 16) and the defendant's motion for summary judgment (Ct. Rec. 19).[1]

22
23

**JURISDICTION**

24
25

Lynda M. Klymko, plaintiff, applied for Title II Disability Insurance
Benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI") on

26
27
28

_____

[1] Plaintiff requested oral argument.  The court exercises its discretion pursuant
to LR 7.1(h)(3) to hear and decide this matter without oral argument.

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT-      1**

October 18, 2002.  The applications were denied initially and on reconsideration.
Plaintiff timely requested a hearing and hearings were held before Administrative
Law Judge (ALJ) R.J. Payne on February 25, 2005, January 12, 2006, and March
28, 2006. Plaintiff was represented by a non-attorney representative at all of these
hearings and testified at the March 28, 2006 hearing.  Anne Winkler, M.D.,
testified as a medical expert at the February 25, 2005, and January 12, 2006
hearings.  On June 6, 2006, the ALJ issued a decision denying benefits.  The
Appeals Council denied a request for review and the ALJ's decision became the
final decision of the Commissioner.  This decision is appealable to district court
pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## STATEMENT OF FACTS

The facts have been presented in the administrative transcript, the ALJ's
decision, the plaintiff's and defendant's briefs, and will only be summarized here.
At the time of the March 28, 2006 hearing, plaintiff was 50 years old.  She has a
college education and past relevant work experience as a telephone solicitor,
office clerk, data entry clerk, receptionist, membership solicitor, and bindery
worker.  Plaintiff alleges disability since July 29, 2002, due to fibromyalgia and an
affective disorder.  Plaintiff's date last insured for DIB is December 1, 2007.

## STANDARD OF REVIEW

"The [Commissioner's] determination that a claimant is not disabled will be
upheld if the findings of fact are supported by substantial evidence, 42 U.S.C. §
405(g)...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983).  Substantial
evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112,
1119 n.10 (9th Cir. 1975), but less than a preponderance.  *McAllister v. Sullivan*,
888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and
Human Services*, 846 F.2d 573, 576 (9th Cir. 1988).  "It means such relevant

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT-     2**

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).  "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld.  *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner.  *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989), quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

It is the role of the trier of fact, not this court to resolve conflicts in evidence.  *Richardson*, 402 U.S. at 400.  If evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ.  *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

A decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision.  *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

**ISSUES**

Plaintiff argues the ALJ  erred in finding plaintiff does not have a "severe" mental impairment, failed to fully develop the record, improperly discounted plaintiff's pain complaints, and erred in failing to have a vocational expert (VE) testify at the March 28, 2006 hearing.

**DISCUSSION**

**SEQUENTIAL EVALUATION PROCESS**

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    3**

or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  The Act also provides that a claimant shall be determined to be under a disability only if her impairments are of such severity that the claimant is not only unable to do her previous work but cannot, considering her age, education and work experiences, engage in any other substantial gainful work which exists in the national economy.  *Id*.

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled.  20 C.F.R. §§ 404.1520 and 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S.Ct. 2287 (1987).  Step one determines if she is engaged in substantial gainful activities.  If she is, benefits are denied.  20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i).  If she is not, the decision-maker proceeds to step two, which determines whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii).  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.  If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); 20 C.F.R. § 404 Subpart P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step which determines whether the impairment prevents the claimant from performing work she has performed in the past.  If the claimant is able to perform her previous work, she is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv).  If the claimant cannot perform this work, the fifth and final step in the process determines whether she is able to perform other work in the national economy in

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    4**

1  view of her age, education and work experience.  20 C.F.R. §§ 404.1520(a)(4)(v)

2  and 416.920(a)(4)(v).

3       The initial burden of proof rests upon the claimant to establish a prima facie

4  case of entitlement to disability benefits.  *Rhinehart v. Finch*, 438 F.2d 920, 921

5  (9th Cir. 1971).  The initial burden is met once a claimant establishes that a

6  physical or mental impairment prevents her from engaging in her previous

7  occupation.  The burden then shifts to the Commissioner to show (1) that the

8  claimant can perform other substantial gainful activity and (2) that a "significant

9  number of jobs exist in the national economy" which claimant can perform.  *Kail*

10 *v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

11

12 **ALJ'S FINDINGS**

13      The ALJ found that plaintiff's fibromyalgia constitutes a "severe" physical

14 impairment, but that her sleep apnea and obesity are "non-severe" impairments.

15 The ALJ also found that plaintiff's affective disorder is "non-severe."   The ALJ

16 found that plaintiff does not have an impairment or combination of impairments

17 that meets or medically equals any of the impairments listed in 20 C.F.R. § 404

18 Subpart P, App. 1.  The ALJ found that plaintiff has the residual functional

19 capacity (RFC)  to perform "light," "skilled" work, specifically that she is capable

20 of occasionally lifting 20 pounds and frequently lifting 10 pounds; that she can

21 stand or walk for 6 hours in an 8-hour workday; that she has no limitation with

22 regard to sitting; that she can push or pull up to 20 pounds; that she is occasionally

23 limited in climbing, kneeling, crouching and stooping, and can never crawl; that

24 she has no manipulative limitations; that she has no visual or communicative

25 limitations; and that she has some limitations to working in extreme temperatures

26 and humid conditions and to being in unprotected heights.  The ALJ found that

27 this RFC allows plaintiff to perform her past relevant work as a telephone

28 / / /

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT-      5**

1  solicitor, office clerk, data entry clerk, receptionist, membership solicitor, and

2  bindery worker.  Accordingly, the ALJ concluded the plaintiff is not disabled.[2]

3

4  **SEVERITY OF MENTAL IMPAIRMENTS**

5      A "severe" impairment is one which significantly limits physical or mental

6  ability to do basic work-related activities.  20 C.F.R. §§ 404.1520(c) and

7  416.920(c).  It must result from anatomical, physiological, or psychological

8  abnormalities which can be shown by medically acceptable clinical and laboratory

9  diagnostic techniques.  It must be established by medical evidence consisting of

10  signs, symptoms, and laboratory findings, not just the claimant's statement of

11  symptoms.  20 C.F.R. §§ 404.1508 and 416.908.

12      Step two is a de minimis inquiry designed to weed out nonmeritorious

13  claims at an early stage in the sequential evaluation process.  *Bowen*, 482 U.S. at

14  148.  See also *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996), citing

15  *Bowen*, 482 U.S. at 153-54 ("[S]tep two inquiry is a de minimis screening device

16  to dispose of groundless claims").  "[O]nly those claimants with slight

17  abnormalities that do not significantly limit any basic work activity can be denied

18  benefits" at step two.  *Bowen*, 482 U.S. at 158.  "Basic work activities" are the

19  abilities and aptitudes to do most jobs, including:  1) physical functions such as

20  walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or

21  handling; 2) capacities for seeing, hearing, and speaking; 3) understanding,

22  carrying out, and remembering simple instructions; 4) use of judgment; 5)

23  responding appropriately to supervision, co-workers and usual work situations;

24  _____

25  [2] Alternatively, the ALJ concluded that because of plaintiff's RFC for a "wide

26  range of light work," a finding of "not disabled" would be directed by Medical-
Vocational Rule 202.21.  The ALJ concluded that plaintiff's non-exertional

27  limitations would have little or no effect on the occupational base of unskilled

28  light work.

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    6**

1   and 6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b)

2   and 416.921(b).

3          In April 2003, plaintiff was seen by Paul Michels, M.D., for a consultative

4   psychiatric evaluation in conjunction with her disability claim.  Dr. Michels

5   reviewed the plaintiff's Social Security file and observed there was a note in there

6   from an employee of Social Security indicating the employee had received an

7   anonymous phone call from someone who stated that plaintiff seemed fully

8   capable of doing almost anything, despite her complaints.  (Tr. at p. 206).  Plaintiff

9   reported to Dr. Michels that starting in 1995, she was treated with Prozac and then

10  later, started taking Paxil for depression.  (*Id.*).  She was prescribed these

11  medications by her primary care doctor (Harold L. Bailey, M.D.) as pain from her

12  fibromyalgia intensified, causing her to develop symptoms of depression.  (Tr. at

13  p. 209).  She had reasonable relief of those symptoms with use of the Paxil.  (*Id.*).

14  Dr. Michels diagnosed the plaintiff on Axis I with "Major Depressive Disorder, In

15  Remission" and assigned her a Global Assessment of Functioning (GAF) score of

16  65.  A GAF score between 61 and 70 is indicative of "mild" symptoms and "some

17  difficulty in social, occupational, or school functioning . . . but generally

18  functioning pretty well" and the individual "has some meaningful interpersonal

19  relationships."  *American Psychiatric Ass'n, Diagnostic & Statistical Manual of*

20  *Mental Disorders*, (4th ed. Text Revision 2000)(DSM-IV-TR).  Dr. Michels

21  indicated that plaintiff was "getting adequate relief with the non-specialized

22  psychiatric care that her primary care doctor is providing" and that the

23  "[p]rognosis for much further change or improvement is quite guarded,

24  particularly in the context of a chronic pain condition."  (*Id.*).  He added that:

25              I don't think that the description provided by the anonymous
                caller is particularly concerning.  It is quite common for
26              persons with fibromyalgia, and even those with fibromyalgia
                combined with depression, to potentially appear as unrestricted
27              or disturbed by their symptoms.  I do not get the sense that
                the claimant is exaggerating or malingering.  I suspect that
28              she indeed does suffer from a chronic pain condition

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-       7**

combined with depressive symptoms. . . . From a purely psychiatric perspective, she seems to have adequate focus, concentration, pace and persistence. She seems quite capable of understanding, remembering, and following instructions. She seems quite capable, and in fact quite interested, in interacting with others. Stress may mildly intensify her depressive and likely (sic) pain symptoms.

(*Id.*).

Based on this psychiatric evaluation, the only mental evaluation of record, the court must conclude that substantial evidence supports the ALJ's determination that plaintiff's affective disorder, as a separate, distinct component from plaintiff's fibromyalgia, is not a "severe" impairment. By itself, the affective disorder does not significantly limit plaintiff's ability to perform basic work-related activities such as understanding, carrying out, and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting.

That said, in determining a claimant's residual functional capacity, the ALJ must consider the limiting effects of all of the claimant's impairments, even those that are not "severe." 20 C.F.R. §§ 404.1545(e) and 416.945(e); Social Security Ruling (SSR) 96-8P. It is not apparent in this case that the ALJ specifically considered the combined limiting effects of plaintiff's severe fibromyalgia and her non-severe affective disorder in determining her overall residual functional capacity and ability to perform past relevant work. Indeed, although the ALJ found that plaintiff did have some non-exertional limitations, they all relate to environmental or postural limitations, as opposed to any limitations that could be said to arise from an affective disorder (i.e., inability to get along with co-workers). This error is not harmless because it is not inconsequential to the ALJ's ultimate non-disability determination. *Stout v. Commissioner of Social Security Administration*, 454 F.3d 1050, 1055 (9th Cir. 2005). At a minimum, this error would require a remand for further proceedings. This court is unable to confidently conclude that no reasonable ALJ could have reached a different

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-     8**

disability determination upon consideration of the combined effect of plaintiff's severe physical impairment and her non-severe mental impairment.   It is the ALJ's obligation, not this court's obligation, to consider the combined effect of non-severe and severe impairments.  Independent findings by this court regarding that combined effect could not be relied upon by a reviewing court since that court is constrained to review the reasons offered by the ALJ for his decision.  *Id*. at 1054.  The decision of an agency cannot be affirmed on a ground the agency did not invoke in making its decision.  *Id*., citing *Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001).

**DEVELOPMENT OF RECORD**

       The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered.  This duty extends to represented and unrepresented claimants.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001).

       In his written decision, the ALJ observed that the medical record revealed plaintiff had been diagnosed with fibromyalgia in 1998, but that the diagnosis itself was not a part of the medical record.  (Tr. at p. 20).  Plaintiff eventually obtained the earlier records (Tr. at pp. 296-382), including those containing the fibromyalgia diagnosis, and submitted them to the Appeals Council in conjunction with her request that the Appeals Council review the decision of the ALJ.  (Tr. at p. 384).  The Appeals Council considered them in denying plaintiff's request for review.  Plaintiff contends the ALJ should have obtained these records and considered them in making his decision.

       The fact that plaintiff eventually obtained these records on her own initiative begs the question why she could not have done so before the ALJ rendered his decision.  And indeed, at the February 2005 hearing, when informed by the ALJ that her records dated back to 2001, the plaintiff indicated that Dr.

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT-     9**

Bailey had diagnosed her with fibromyalgia in 1996 and that she could request those records. The ALJ's response was that "[y]ou can go ahead and give us that," and that anything from plaintiff's treating physician would be "very helpful." (Tr. at p. 42).

To the extent, if any, that the ALJ erred in not obtaining the records, it is harmless and inconsequential, particularly considering this court's reversal of the ALJ's non-disability determination on other grounds discussed *infra*.

**PHYSICAL RESIDUAL FUNCTIONAL CAPACITY (RFC)**

The ALJ found that plaintiff's statements concerning the intensity, duration and limiting effects of her fibromyalgia are not entirely credible.

An ALJ cannot reject a plaintiff's statements about pain merely because they are not supported by objective evidence. *Tonapeytan*, 242 F.3d at 1147-48. "In assessing the claimant's credibility, the ALJ may use ordinary techniques of credibility evaluation, such as considering the claimant's reputation for truthfulness and any inconsistent statements in her testimony." *Id*. at 1148. See also *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.2002)(following factors may be considered: 1) claimant's reputation for truthfulness; 2) inconsistencies in the claimant's testimony or between her testimony and her conduct; 3) claimant's daily living activities; 4) claimant's work record; and 5) testimony from physicians or third parties concerning the nature, severity, and effect of claimant's condition). An ALJ must offer clear and convincing reasons for rejecting a claimant's subjective statements about pain and resulting limitations. *Smolen*, 80 F.3d at 1281-82.

Anne Davis Winkler, M.D., testified as a medical expert. At the February 25, 2005 hearing, Dr. Winkler testified that she could not determine from the record if the plaintiff had fibromyalgia. Accordingly, the ALJ ordered a consultative examination to determine the existence of "tender points." (Tr. at pp.

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-      10**

38-39). Michael J. Carraher, M.D., Post Falls Internal Medicine, performed this examination- "trigger point testing" -on August 16, 2005. Dr. Carraher noted that plaintiff had previously been examined by Robert Rose, M.D., in April 2005, who indicated that plaintiff's "diffuse myofascial pain syndrome cannot be corroborated based on objective findings or facts." (Tr. at pp. 269 and 282).[3] Dr. Carraher found that plaintiff tested "positive" for tenderness on 7 of 18 trigger points. (Tr. at p. 290).[4] He noted although he had been asked to do the testing with and without distraction, it was impossible to check the points "with distraction" since the plaintiff was quite knowledgeable about which points should be tender. Consequently, he considered the reliability of the testing to be "somewhat uncertain." He noted that plaintiff "specifically seemed to be tender in the right occiput, both supraspinatus areas, both greater trochanters, and both knees." (Tr. at p. 284). Dr. Carraher's assessment was "probable fibromyalgia, apparently mild to my exam." According to him:

---

[3] Dr. Rose had also seen the plaintiff in April 2003. He did not diagnose the plaintiff with fibromyalgia at that time either. Instead, his assessment was that plaintiff had "[p]olymyalgias, without confirmatory findings of trauma, muscle fasciculations, atrophy, or other findings suggestive of organic disease." (Tr. at p. 203). It also appears, however, that Dr. Rose did not perform "trigger point testing" on the plaintiff.

[4] In September of 2001, Mary Noble, M.D., checked plaintiff's fibromyalgia trigger points and reported that plaintiff had "7/18 very definite positive points." (Tr. at pp. 360-61). Dr. Noble did not question diagnosing plaintiff with fibromyalgia even though she did not have the requisite number of positive trigger points (11). (Tr. at p. 361). Apparently, neither Dr. Winkler or Dr. Carraher would have known about this since Dr. Noble's September 2001 note was not made part of the record until after the ALJ's decision. Dr. Noble saw the plaintiff again in July 2002, and this time the testing indicated three points were "particularly tender." (Tr. at p. 196). Dr. Noble's July 2002 note was part of the record considered by the ALJ.

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT-    11**

> Her symptoms are primarily self-reported limitations. She has not had any formal physical capacities evaluation that I can see. She states she previously worked as a database coordinator but had to quit doing this because of hunching over a computer for long periods of time. She states she later worked as a telephone solicitor. It's unclear to me why she would be unable to do these jobs. . . . . I see no reason that she could not do light-to-medium work as defined by the Dictionary of Occupational Titles. A more formal evaluation is filled out on her medical source statement of ability to do work-related activities. Her perceived limitations seem to be in excess of objective findings.

(Tr. at p. 285).

In a "Medical Source Statement Of Ability To Do Work-Related Activities" form, Dr. Carraher indicated plaintiff was capable of occasionally lifting 25 pounds and frequently lifting 20 pounds; capable of standing and/or walking about 6 hours in an 8 hour day; capable of unlimited sitting; capable of unlimited pushing and/or pulling using hand or foot controls; and capable of occasional balancing, kneeling, crouching, crawling, and stooping, but no climbing. (Tr. at pp. 286-89).

Dr. Carraher apparently did not know that plaintiff's primary care physician, Harold L. Bailey, Jr., M.D., had completed a "Physical Capacities Evaluation" form regarding the plaintiff in December 2003, or if he knew of it, did not consider it be a "formal" evaluation. As early as May 1998, Dr. Bailey had diagnosed "some elements" of plaintiff's myofascial pain as consistent with fibromyalgia. (Tr. at p. 303). In his "Physical Capacities Evaluation" form, Dr. Bailey indicated plaintiff was capable of sitting less than 2 hours in an 8 hour workday, standing less than 2 hours in an 8 hour workday, would need to be able to sit or stand at will throughout the day, was capable of simple grasping with both hands, was capable of pushing and pulling 10 pounds or less, was capable of fine manipulation in 10 to 15 minute increments, was capable of using both her feet for operating foot controls, could occasionally lift 6 to 10 pounds and frequently lift 0 to 5 pounds, and occasionally reach above shoulder level, but was unable to climb,

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-      12**

balance, stoop, kneel, crouch and crawl.  He indicated that plaintiff's pain was disabling to the extent it would prevent her from working full-time in even a sedentary position, and that it constituted a significant impairment of sustained attention and concentration such as would preclude her from performing skilled work tasks.  (Tr. at pp. 252-54).  He also indicated that plaintiff "consistently exhibit[ed] pain on palpation in at least 11 of the 18 tender point sites consistent with Fibromyalgia as identified by the American College of Rheumatology and the Center For Disease Control."  (Tr. at p. 255).  It is not apparent, however, if Dr. Bailey did this trigger point testing himself, or if he was referring to testing by some other physician.

In May of 2005, just after the February 2005 hearing and shortly before the August 2005 consultative examination by Dr. Carraher, plaintiff was examined by Meredith A. Heick, M.D., of the Physicians Clinic of Spokane Rheumatology. Plaintiff was referred to Dr. Heick by Dr. Bailey for evaluation of pain.  Dr. Heick apparently found tenderness on 14 of 18 trigger points.  (Tr. at p. 279).

Dr. Winkler testified again at the January 12, 2006 hearing.  Based on her review of the record, including the consultative examination of Dr. Carraher, Dr. Winkler indicated that plaintiff appeared to have myofascial pain, although not fibromyalgia due to "the lack of [a] significant number of trigger points."  (Tr. at p. 48).  Dr. Winkler noted that it is necessary to have at least 11 of 18 trigger points in order to qualify for a diagnosis of fibromyalgia and that Dr. Carraher had found tenderness on only 7 of 18 trigger points.  (*Id*.)  Dr. Winkler discounted Dr. Heick's finding of tenderness on 14 of 18 trigger points, asserting that one "should not expect that much variation in the presence or absence of trigger points unless there's been a significant improvement in the clinical situation."  (Tr. at pp. 48-49).  In other words, Dr. Winkler asserted there was no evidence to support such a radical improvement in plaintiff's condition so as to explain how she could have 14 trigger points in May 2005, and only 7 just a few months later in August 2005.

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    13**

1    Dr. Winkler opined that plaintiff was capable of frequently lifting 10 pounds and

2    occasionally lifting up to 20 pounds; that she could stand and/or walk for 6 hours

3    in an 8 hour workday; that there was no limit on her capacity for sitting; that she

4    could push or pull up to 20 pounds using hand or foot controls; that she could not

5    do any crawling, but could occasionally stoop, crouch, kneel, and climb, and

6    frequently engage in balancing. Because of plaintiff's myofascial pain, Dr.

7    Winkler indicated it would be advisable for plaintiff to avoid work environments

8    involving temperature extremes and humidity. (Tr. at pp. 49-50; 291-93).

9         Plaintiff testified that she missed working, in particular the "social aspects"

10   of it, but could not perform the keyboarding required in most jobs because her

11   condition affects her wrists, arms, shoulders, and neck to the point where she

12   cannot move them or they go numb. Plaintiff testified the only way she could

13   perform a job is if an employer would allow her the flexibility to take days off

14   when she is in too much pain. (Tr. at pp. 77-78). According to plaintiff, on

15   average each month, there are four or five days when she experiences pain at the 8

16   to 9 level on a scale of 1 to 10. (Tr. at p. 81).

17        The ALJ found that although plaintiff's fibromyalgia "could reasonably be

18   expected to produce the alleged symptoms, . . . the [plaintiff's] statements

19   concerning the intensity, duration and limiting effects of these symptoms are not

20   entirely credible." (Tr. at p. 23). The ALJ noted that plaintiff had been counseled

21   on several occasions to exercise to alleviate her symptoms, including swimming,

22   and that she was advised to use a hot tub. According to the ALJ, there was no

23   evidence in the record, including plaintiff's own hearing testimony, indicating

24   she had followed this advice. It is true that plaintiff did not testify about

25   exercising or using a hot tub, but it is also true that she was not specifically asked

26   about these matters by either her non-attorney representative or the ALJ. Nowhere

27   in the record did plaintiff make any admission that she has not attempted exercise

28   or not been using a hot tub. To the contrary, plaintiff told Dr. Carraher in August

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    14**

2005 that she was doing water exercises with her "fibromyalgia group" three times a week. (Tr. at p.283). In his April 2006 letter addressed to the ALJ, the plaintiff's husband indicated that during the family's yearly trip to Hope, Idaho, the plaintiff spends time swimming in the indoor heated pool and using the hot tub and sauna. (Tr. at p. 181). Furthermore, there is no dispute that plaintiff consistently takes  prescription and non-prescription medication to relieve pain. (Tr. at pp. 81-82).

The ALJ noted plaintiff's testimony that she missed the social interaction involved in working and asserted this did not connect with her other testimony indicating she is a member of a tatting guild[5] and is active in her church.  The ALJ noted that plaintiff had told Dr. Michels that she enjoyed chatting with people at her husband's place of work, enjoyed chatting with her neighbors, and that she was helping to coordinate the yearly tatting guild and was in charge of food. (Tr. at pp, 23-24). The fact that plaintiff continues to engage in some social interaction outside of the work environment does not mean that she does not miss the additional social interaction she enjoyed when she was working.  If anything, it supports her claim that she misses the social interaction involved in working. Furthermore, it is not apparent how the social interaction plaintiff enjoys outside of the workplace reflects on her capacity to tolerate the exertional and non-exertional demands of a work environment.

The ALJ noted plaintiff's testimony that she cannot do keyboarding because of pain in her wrists, arms, shoulders and neck, but asserted that plaintiff's tatting involves intricate movements and use of these same body parts. (Tr. at p. 24). Obviously, however, keyboarding in a work environment is something typically required for a majority, if not all, of the workday. Tatting is a recreational activity for the plaintiff and she testified to that which is obvious: she can put down her

---

[5] Tatting involves making lace by tying knots. (Tr. at p. 69).

tatting when she starts to experience pain. (Tr. at p. 75). Plaintiff testified she tats for 15 to 45 minutes on average every day, broken up into small increments of time throughout the day. (Tr. at p. 70).

At the hearing, plaintiff was asked by her representative if she was feeling any symptoms from having been seated for awhile during the hearing. Plaintiff answered "no," although she stated she would if she were required to stand up and walk. (Tr. at p. 74). Later, the ALJ asked the plaintiff if she was experiencing any pain "today" and plaintiff indicated that she was in her knees, arms, neck, shoulders, back and chest, and that it was at a level 6 or 7 on a 1 to 10 scale. (Tr. at p. 81). These statements are not necessarily inconsistent, however, since the ALJ did not specifically ask the plaintiff if she was experiencing pain at that precise moment while she was sitting, as opposed to whether she had experienced pain at anytime "today," be it while she was sitting, standing or walking.

The ALJ gave "significant" weight to the opinions of Dr. Carraher and Dr. Winkler. Dr. Carraher, of course, saw the plaintiff on a single occasion. Dr. Winkler never examined the plaintiff and for that matter, unlike Dr. Carraher, did not consider the plaintiff to be suffering from fibromyalgia. While Dr. Rose examined the plaintiff on at least two occasions, he apparently never did any trigger point testing and did not diagnose the plaintiff with fibromyalgia. With regard to the treating physician, the ALJ found that "Dr. Bailey's findings are not supported by the clinical findings of fibromyalgia[,] nor are they supported by the claimant's subjective complaints." (Tr. at p. 25). Whether or not that is true (i.e., because Dr. Bailey may never have done any trigger point testing), the fact is that the ALJ found that the record supports a diagnosis of fibromyalgia for the plaintiff and that this impairment is "severe."[6]

---

[6] As such, it is of no consequence that Dr. Rose concluded that plaintiff's complaints of myofascial pain could not be corroborated based on objective

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    16**

The ALJ stated that because there was "no medical evidence of record that a treating physician did diagnose fibromyalgia," he "gave limited weight to the opinions of the treating physician[]." (Tr. at p. 25). As would be revealed later, however, when additional records were submitted by the plaintiff to the Appeals Council for consideration, Dr. Bailey had in fact diagnosed the plaintiff with fibromyalgia as early as 1998. As it turns out then, the ALJ did not offer a specific and legitimate reason for rejecting the opinion of Dr. Bailey as to plaintiff's exertional limitations.[7] Bolstering Dr. Bailey's opinion is Dr. Michels who opined there was no reason to doubt plaintiff's complaints of chronic pain and that as a result of that pain, it was natural for her to experience some depression. The detailed letter written by plaintiff's husband (Tr. at pp. 180-82) attesting to the progressive decline in plaintiff's physical abilities over the years is consistent with the physical limitations opined by Dr. Bailey. The ALJ acknowledged plaintiff's "extensive employment history" (Ct. Rec. 22), a fact which bolsters her credibility and indicates that she enjoyed working. Nothing the plaintiff told her treating

findings of fact.

[7] It is settled law in the Ninth Circuit that in a disability proceeding, the treating physician's opinion is given special weight because of his familiarity with the claimant and her physical condition. *Benecke v. Barnhart,* 379 F.3d 587, 592 (9th Cir. 2004); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); *Smolen v. Chater,* 80 F.3d 1273, 1285-88 (9th Cir. 1996); *Flaten v. Secretary of Health and Human Serv*., 44 F.3d 1453, 1463 (9th Cir. 1995); *Fair v. Bowen*, 885 F.2d 597, 604-05 (9th Cir. 1989). If the treating physician's opinion is not contradicted, it can be rejected only with clear and convincing reasons. *Lester,* 81 F.3d at 830. If contradicted, the ALJ may reject the opinion if specific, legitimate reasons that are supported by substantial evidence are given. *See Flaten*, 44 F.3d at 1463; *Fair*, 885 F.2d at 605.

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    17**

physician or to examining physicians about her daily activities is inconsistent with the physical limitations she testified to at the March 2006 hearing.

Based on the foregoing, this court concludes that the ALJ did not offer clear and convincing reasons for rejecting plaintiff's subjective statements about her pain and resulting limitations. Crediting those statements, which are corroborated by the opinion of Dr. Bailey, this court finds the ALJ erred in determining that plaintiff is capable of performing her past relevant work. Furthermore, based on the same, it is clear that plaintiff would not be capable of performing any substantial gainful work in the national economy. *Lester*, 81 F.3d at 834 ("[W]here the ALJ improperly rejects the claimant's testimony regarding [her] limitations, and the claimant would be disabled if the testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony" and instead, that testimony is "credited as a matter of law"). Accordingly, the plaintiff is disabled and has been so since at least July 29, 2002, her claimed onset date of disability.

## CONCLUSION

Plaintiff's motion for summary judgment (Ct. Rec. 13) is **GRANTED** and defendant's motion for summary judgment (Ct. Rec. 19) is **DENIED**. Pursuant to Sentence Four of 42 U.S.C. §405(g), the Commissioner's decision denying benefits is **REVERSED** and this matter is **REMANDED** to the Commissioner for payment of benefits to the plaintiff in accordance with the applicable law.

**IT IS SO ORDERED.** The District Executive shall enter judgment accordingly and forward copies of the judgment and this order to counsel.

**DATED** this __8th__ of May, 2007.


___s/ Alan A. McDonald_____
ALAN A. McDONALD
Senior United States District Judge

**ORDER GRANTING PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT-    18**